**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.:

MICHAEL W. DINNEN, an individual, and
JAKS Holdings, LLC, a Colorado LLC,

      Plaintiffs,

v.

TIMOTHY KNEEN, an individual,
MICHAEL ROBERTS, an individual,
TIMOTHY FLAHERTY, an individual,
CARL VERTUCA, an individual, and
PdC, LLC, a Colorado LLC,

      Defendants.

---

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
AND DEMAND FOR JURY TRIAL**

---

Plaintiffs Michael W. Dinnen ("Dinnen") and JAKS Holdings, LLC ("JAKS") ("Plaintiffs"), by and through undersigned counsel, respectfully submit this Complaint for Violations of the Federal Securities Laws and Demand for Jury Trial ("Complaint").

## NATURE AND SUMMARY OF THE ACTION

1.    Plaintiffs are investors in Defendant PdC, LLC ("PdC"). The claims in this action arise from the materially false and/or misleading statements made by Defendants PdC, Timothy Flaherty, Timothy Kneen, Michael Roberts, and Carl Vertuca (collectively "Defendants") in order to induce investors, including Plaintiffs, to invest in a luxury real estate development scheme. Defendants made repeated and explicit material misstatements of fact about the return on investment ("you will double your money"), the safety of the investment, and the status of the

project, and omitted critical information, including the fact that the developers were unable to obtain the requisite permitting and the property was subject to a multi-million dollar senior lien and major litigation, all in violation of Sections 10 of the Securities Act of 1993.  Plaintiffs have not received a single penny from their investment, nor have they been able to obtain an adequate accounting of how their money has been spent.  Instead, Plaintiffs have uncovered numerous material misstatements and omissions that were knowingly made by the Defendants to sell securities in PdC. The timeline of critical events, described in greater detail below, is:

- **July 25, 2007** – PdC, LLC formed.

- **November 27, 2008** – A Mexican company subsequently affiliated with PdC signs contract guaranteeing a $5,600,000 debt owed by Mustapha Bouzid Mohamed Arab to Hotusa and granting a first lien on the Property.

- **2008 – 2009** – Plaintiff Dinnen purchases B Shares upon being advised that this was a limited time offer, would guarantee a "doubling of your money," and that the property was a one-of-a-kind, high end development with all permitting in place.

- **2009-2010** – Members of Plaintiff JAKS purchase B shares based on the same representations.

- **April - October 2010** – Investors advised that permitting is complete.

- **July 12, 2010** – Hotusa files suit against Mexican subsidiary for $5,600,000 plus interest and costs. This is not disclosed to Plaintiffs.

- **February 27, 2012** – PdC, LLC acquires additional property subject to a first lien guaranteeing a $5,600,000 debt owed by Mustapha Bouzid Mohamed Arab to Hotusa, which was subject to ongoing litigation.

- **May 9, 2012** – At Flaherty's request, Plaintiff Dinnen wires money to PdC, pursuant to a Letter Agreement to purchase Mezz securities.

- **June 1, 2014** – Mexican court issues an order in litigation brought by Hotusa ordering PdC to pay Hotusa $5,600,000 plus interest and confirming its lien on the property.

- **August 2014** – Defendants hold a conference call with investors. For the first time they disclose the Hotusa debt, lien, and litigation.

## PARTIES

2.      Plaintiff Michael W. Dinnen is an individual and resides at 4 Glenmoor Circle, Cherry Hills Village, CO 80113.

3.      Plaintiff JAKS Holdings, LLC is a Colorado limited liability company with its principal place of business located at 10 West End Avenue, Suite 9C, New York, NY 10023.

4.      Defendant Timothy Kneen ("Kneen") is an individual who resides at 8400 Witez Ct., Parker, Colorado 80134.  Kneen is or was an organizer, owner and manager of PdC and holds a Class A voting share in PdC.  Kneen holds or held this position either individually, through The J.H.K. Venture Capital Limited Partnership located at 15075 Al-jon Ave, Ottumwa, IA 52501, or through another unidentified entity.

5.      Defendant Timothy Flaherty ("Flaherty") is an individual who resides at 6655 North 66th Place, Paradise Valley, AZ 85253.  Flaherty is or was an organizer, owner and manager of PdC and holds a Class A voting share in PdC.  Flaherty holds or held this position either individually, through Crystal Cascades, LLC located at 856 NE Mount Mystery Loop, Poulsbo, WA 98370, or through another unidentified entity.

6.      Defendant Michael Roberts ("Roberts") is an individual who resides at 245 Linden Drive, Boulder, Colorado 80304.  Roberts is or was an organizer, owner and manager of PdC and holds a Class A voting share in PdC.  Roberts holds or held this position either individually, through Michael J. Roberts, LLC located at 2425 Balsam Drive, Boulder, CO 80304, or through another unidentified entity.

7.     Defendant Carl Vertuca ("Vertuca") is an individual who resides at 5955 Cordwood Court, Boulder, Colorado 80301.  Vertuca is or was an organizer, owner and manager of PdC and holds a Class A voting share in PdC.  Vertuca holds or held this position either individually, through The Vertuca Group, LLC located at 6955 Cordwood Court, Boulder, CO 80301, or through another unidentified entity.

8.     Defendant PdC, LLC is a Colorado limited liability company with its principal place of business at 1601 Blake Street, Suite 310, Denver, Colorado 80202.

9.     At all times relevant to this Complaint, Defendants Flaherty, Roberts, Kneen, and Vertuca (collectively "Individual Defendants"), directly or indirectly, controlled PdC. Defendants Flaherty, Roberts, and Kneen, directly or indirectly, served as the only managers of PdC and controlled 84% of the voting equity interests (Class A Membership Shares) of PdC.

10.    Also at all times relevant to this Complaint, Defendant Vertuca was and/or served as the Chief Financial Officer of PdC and, directly or indirectly, controlled at least 5% of the Class A voting shares of PdC.

11.    This action concerns the Defendants' efforts to acquire and develop a beachfront resort on Xpu-Ha Beach, south of Playa del Carmen, Mexico, alternatively known as the "Riviera Beach Club," "Maya Riviera," and "Sereno Beach Resort" (hereinafter referred to as the "Sereno Project"), among other names known to Defendants and unknown to Plaintiffs. Defendants offered for sale and sold investments in securities related to the Sereno Project.  At all times relevant to this Complaint, Defendants offered the investments through PdC.  PdC, in turn, worked through its subsidiary, Riviera SRL, in Mexico.

**Jurisdiction and Venue**

12.     This Complaint asserts claims that arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. §§ 78j(b), and 78t(a)) and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (17 C.P.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).   This Court has jurisdiction over the related state law claims under 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because the principal place of business of Defendant PdC is in Colorado and because the Individual Defendants either reside in Colorado or have invested and became managers of a Colorado limited liability company with investors located in Colorado.

15.     This Court has personal jurisdiction over Defendants because the principal place of business of Defendant PdC is in Colorado and because the Individual Defendants either reside in Colorado or have invested and became managers of a Colorado limited liability company with investors located in Colorado.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and email.

**FACTUAL ALLEGATIONS**

17.     PdC was formed July 25, 2007.   PdC formed a Mexican subsidiary Riviera Country Club S de R.L. de C.V. ("Riviera Country Club"). Riviera Country Club is 99% owned

by PdC and 1% owned by a related company for reasons of Mexican law, and, in the interest of clarity, both entities will be referred to subsequently as "PdC."

18.     In 2008, Individual Defendants, through PdC and its subsidiaries, acquired a strip of beachfront property on Xpu-Ha Beach, south of Playa del Carmen, Mexico, for approximately $8.5 million (the "Sereno I").

19.     In 2008, Desarrollos Turisticos Riviera XPU-HA, S.A. de C.V.  acquired property adjacent to Sereno I from Mustapha Bouzid Mohamed Arab (the "Sereno II").  Sereno II was subject to a first lien in favor of the Spanish hotel chain Hoteles Turisticos Unidos, S.A. ("Hotusa"), guaranteeing a debt of $5,600,000.  On November 27, 2008, Desarrollos Turisticos Riviera XPU-HA, S.A. de C.V. signed a contract guaranteeing the $5,600,000 debt owed by Mustapha Bouzid Mohamed Arab to Hotusa and granting a first lien on Sereno II.

20.     Also in 2008, through a limited liability company controlled by them, Defendants Flaherty, Roberts, and Kneen acquired a parcel of beachfront land located near Sereno I. Defendants Flaherty, Roberts, and Kneen then constructed a 6,000 square foot house for personal use (the "Beach House").

21.     Plaintiff Dinnen met Flaherty and Kneen in 2007 and in 2008, Flaherty and Kneen encouraged Mr. Dinnen to visit the Beach Property and stay at the Beach House.  While in Mexico, Flaherty and Kneen pitched the planned Sereno Project real estate development, and advised investors, including Plaintiffs, that by investing in the project, they would "double your money."

22.     The individual members of Plaintiff JAKS were also advised that by investing in the Sereno Project they would double their money.  Messrs. James Deighan and Kevin Holbrook

were first advised about the guaranteed return on investment during a dinner with the Individual

Defendants at the Capital Grill in Denver in 2008.   During a golf trip in 2010, Messrs. Andrew

Weber, M.D., and Steven J. Heaslip, along with Deighan, Holbrook and Dinnen, were all told

that their investment was "safe" and would result in a doubling of their money.   Flaherty,

Roberts and Kneen participated in that particular sales presentation.

23.     At or around the Summer of 2008, Defendants also held an interested investor

meeting at Oz Architects in Denver which Vertuca, Kneen, Vertuca's daughter, Darcey Vertuca,

and others via video conference call made representations concerning the use and scope of the

Sereno Project as well as the safety of the investment.   Dinnen and representatives from JAKS

were present.

**A.     The B Units Offering**

24.     Commencing before February 2009, Individual Defendants began offering

investments in PdC structured as B Units in PdC (the "B Units").

25.     On or about February 2, 2009, on behalf of PdC, Vertuca sent Plaintiff Dinnen the

B Units Private Placement Memorandum dated January 29, 2009 (the "PPM"), attached as

**Exhibit A**.   Members of Plaintiff JAKS were subsequently provided with the PPM as well.

26.     The PPM described the B Units offering as up to $5,000,000 in non-voting Class

B Units of PdC.   According to the PPM, the B Units, or any partial investment in a B Unit, were

to receive a 100% (2X) return on investment.   PPM, Exhibit A at 7 ("The Class B Units are

entitled to a distribution of their capital contribution(s) and a return of one times that capital

contribution(s)."   In addition, a B Units purchaser was entitled to receive a 20% discount on the

purchase of one of the housing units, also known as villas, in the Sereno Project.   *Id*. at 7-8.

27.     According to the PPM, these securities were offered based on the exemption from registration as set forth in §4(2) and Rule 506 of Regulation D of the Securities Act of 1933.

28.     The purposes of the B Units were described in the PPM, as well as verbally to Plaintiffs, and included the development of the Sereno Project, comprised of approximately 38 units, or villas, on beachfront property.  Disclosed Projected Uses of the investment proceeds specifically included paying for the costs of the B Units offering (estimated at $250,000) and "to complete the designs of the spa, villas, bungalows and beach clubhouse and pool; finalize zoning and permitting on Phase I, begin site preparation work and start pre-sales activity."  PPM, Exhibit A, at 13.  Disclosed Projected Uses also included additional operating capital.

29.     The units, or villas, were to be constructed and sold "at a price point that is approximately one half the cost of other comparable units in the area."  PPM, Exhibit A, at 6.

30.     The PPM expressly stated that "[f]rom this date forward, none of the proceeds from this Offering will be used for Phase II of our planned development."  *Id*. Phase II was to consist of "an exclusive, residential golf course community that would include a welcome center, wellness and tennis center, an adult pool and a family pool and entertainment center on an adjacent property."  *Id*.

31.     The PPM disclosed that PdC had executed a Promissory Purchase Agreement with the owner of the adjacent property where the Phase II golf course would eventually be built.

32.     PdC never had a legal right to develop the Sereno I property because Defendants never acquired the necessary permits.  They also never had a right to purchase or develop the adjacent property.  Defendants knew at the time they made these statements that they were materially false and misleading.

33.     At no time were Plaintiffs told that proceeds from the B Units offering would be used to pay for travel and expenses of the Individual Defendants in using the Beach House or other personal/business trips.

34.     The PPM did not disclose that the Sereno II property that the developers were interested in purchasing and developing was subject to a first lien in favor of Hotusa, guaranteeing a debt of $5,600,000.

35.     Exhibit A to the PPM was entitled "Financial Projections" and included a table entitled "Cash Flow Projections."   This section opened with a statement that "[t]he Company believes that all material items that would affect these discussions have been entered therein."

36.     The Financial Projections and accompanying table did not clearly disclose any permitting costs, regulatory compliance costs, or fees for professional services.   Although PdC had already entered into a contract with Oz Architecture, and thus had concrete information regarding the budgeting and fees for its services, those expenses were not projected.   Nor were the fees to the regulatory licensing consultant hired to assist with local permitting.

37.     Instead, the "Expenses/Uses" section of the Cash Flow table read like a list of amenities.   There are cost categories for "Entrance Gate, Flag Receptions, Golf Club House, Golf Club Bar & Restaurant, Turn Grille, Wellness Center, Village Market, Beach Spa, Beach Grill/Bar, Fine Dining, Beach Club, [and] Golf Course."   Many of these amenities did not have any projected costs through 2014.   Other, more relevant, cost categories were stated in broad terms such as "Dev. OH + Prior Period Expense" or "Resort Maintenance."

38.     The Financial Projections' were knowingly misleading, inaccurate or prepared with reckless disregard for accuracy. The Financial Projections' omitted known expenses that

would come due in the near future, while placing precise estimates on amenities, such as a "Flag Reception," that were distant and highly speculative.  The Financial Projections' projected costs were wildly and unreasonably understated.

39.     In an email to JAKS member James Deighan, dated January 12, 2009, Kneen summarized the expected financial return from the project – "how compelling the numbers are" – representing the following, which he knew to be material and misleading:

a.      The revenue would be $50-70 million.

b.      Construction costs would be $16.2 million.

c.      There would be minimal leverage, with $3-8 million contributed by B shares.

d.      These $3-8 million in B shares would receive $3-8 million in preferred returns, a 100% return on their investment.

e.      The remaining costs would be $4 million in sales and $250-300K for an architect and engineer.

40.     The January 12, 2009 communication did not disclose any permitting cost or regulatory risk, a material omission.  The only risk disclosed was a failure to sell sufficient units pre-construction.

41.     Flaherty, Kneen, Vertuca, and PdC employee Giv Mattingly promoted investment in B Units, representing to Plaintiffs, among other things, the following, which they knew to be material and misleading:

a.      The B Units had limited availability, due to favorable investor terms and demand.  There would only be ten units offered;

b.      Within 18-24 months, the investment would double in value, at which time Plaintiffs could either cash out or apply the appreciated value of the B Units investment towards the purchase of a villa in the Sereno Project at the promised 20% discount;

c.      Construction was to begin immediately and everything was ready to go; PdC was only waiting for issuance of an already approved final environmental permit when, in reality, Defendants did not have the final zoning, permits and financing to begin construction;

d.      In fact, as of October 13, 2010, Plaintiffs were advised that the Sereno Project had "been granted the last permit by the City for the Cenote Villas!" which would allow the developers to build the six residential buildings in the Cenote area, the Spa and the Lobby / Welcome area, and would allow Defendants to move forward with the construction loan with the bank;

e.      The Offering would be capped at $5 million (it ultimately exceeded $5 million to approximately $5,635,409).

42.     On April 14, 2010, Vertuca demanded that Deighan pay the remaining $150K he had committed, and provided wire transfer instructions.  In that email, Vertuca represented that Defendants would "get our permits by late next week . . . and we will begin contracting with all our sub-contractors."

43.     None of the Defendants, in the course of their disclosures to Plaintiffs and conversations with Plaintiffs, at any time disclosed the following information, which they knew and knew to be material to Plaintiffs' respective decisions whether to invest in the B Shares:

a.     The Sereno I property was insufficient to build the 38 unit Sereno project as designed and presented to Plaintiffs;

b.     Neither the firm Oz Architecture, which PdC had engaged as architect and which employed Darcey Vertuca, Vertuca's daughter, as a lead architect on the Sereno, nor Darcey Vertuca had experience designing, budgeting and building a project in Mexico like Sereno;

c.     PdC did not have adequate governmental permission to build what the Defendants had designed;

d.     Approximately $600,000 that flowed through PdC would be used to repair and maintain the Defendants' personal Beach House, and Defendants would seek to classify those funds as an investment in PdC;

e.     Some of the proceeds of the Offering would be used to develop and maintain a restaurant in downtown Playa del Carmen that would operate as a private club and, supposedly, a sales office; and

f.     Some of the proceeds would be used for lavish travel and recreation expenses incurred by Initial Defendants, their families, and friends.

Based upon information received from the Defendants, including the misrepresented information, and without the benefit of material information knowingly withheld by the Defendants, Plaintiffs decided to invest in the B Units.

**B.      Time Between the B Units and the "Mezz" Offering**

44.      On July 12, 2010 the Spanish hotel chain Hotusa filed suit against Desarrollos Turisticos Riviera XPU-HA, S.A. de C.V. for foreclosure of the Sereno II property (the "Hotusa Litigation").

45.      On February 27, 2012, Riviera Country Club acquired the Sereno II property, subject to the mortgage granted to Hotusa in the amount of $6 million, and assumed the litigation rights and obligations under the Hotusa Litigation.

46.      Hotusa asserted that PdC was a guarantor for the debt and brought action for payment of that debt, plus interest. As described below, the Mexican court ultimately found in favor of Hotusa, resulting in a judgment of approximately $11 million including pre-judgment interest and fees.

47.      The existence of this litigation and claim was not disclosed to Plaintiffs until August 2014.  During all of the communications described below, including regular updates on the progress of the Sereno Project, and the communications that solicited the Mezz round of financing from Plaintiff Dinnen, Defendants were aware of this substantial litigation and the underlying material obligation and knowingly failed to disclose this information to Plaintiffs.

48.      Between 2009 and May 2012, when Plaintiff Dinnen was induced to make his second investment in the Sereno Project, the Defendants provided no detailed financial information on the Sereno Project and no information on the use of the B Units proceeds. Instead, Defendants provided to Plaintiffs, and others, a continuing stream of positive news that gave the impression that the Sereno Project was proceeding well, which the Defendants knew was material and misleading. For example:

a.      In April 2010, Defendants provided an update from PdC employee Chris Rauton stating that the project had received the final environmental permit and a "green light" from Mexico federal authorities, allowing the project to go "full steam ahead";

b.      In May 2010, Defendants provided an update stating that the project had received over $14 million in capitalization, numerous permits, and "permission to move forward"; in addition, the update stated there were eight pending sales to persons not connected with the Sereno Project;

c.      Later that month, Defendants provided an update that the project had received sales/purchase reservations for 24 of the planned 38 villas;

d.      On October 13, 2010, Defendants provided an update from Chris Rauton stating the Sereno Project had been granted "the last permit by the City for the . . . Villas!"; it also stated that the Sereno Project had attracted a major luxury operator, raised $15 million in capitalization and signed over 25 pre-sale contracts, "This allows us to move forward with the construction loan with our bank"; upon information and belief, there was not then, or ever, a commitment from a construction lender for a construction loan; and

e.      In July 2011, Defendants provided a "Construction Update" stating inspectors had determined the Sereno Project was in "full compliance"; in addition, the update stated that foundation piling designs were being completed; upon information and belief, those designs were never completed, and the pilings were never built.

49.     Other communications were similar and, as stated, always positive. In fact, none

of the Defendants or Individual Defendants identified any problems with the Sereno Project, its

construction or receipt of the promised returns.

50.     Sometime prior to December 2010, the Defendants informed Plaintiffs that PdC

had entered into a partnership with SV Capital, an Englewood, Colorado, firm the Defendants

represented had substantial expertise in developing projects like the Sereno Project. The

Defendants did not tell Plaintiffs at that time, or until 2014, that SV Capital:

      a.     told the Defendants they could not construct the Sereno Project as

planned;

      b.     told Defendants they would need to acquire a multi-million dollar adjacent

parcel of property to complete the Sereno Project;

      c.     required payment of a monthly management fee that Defendants did not

have the funds to pay; and

51.     In 2011, the Defendants collected additional money from Plaintiff Dinnen for

deposits toward the purchase of a villa in Sereno. On May 26, 2011, Dinnen executed an

Amended Deposit and Reservation Agreement dated February 23, 2011("Deposit Agreement").

This agreement increased the amount of the deposit from $10,000, paid September 11, 2010, by

an additional $110,106, and authorized the entire sum to be released immediately out of escrow.

The call for additional money and immediate release of funds was a clear indication to Plaintiff

of a need for the deposited funds for use in construction of Sereno. The deposit contract also

stated that the deposit would be refunded to the purchasers upon request if construction had not

commenced by December 31, 2011.  Dinnen has obtained a partial refund of his deposit but not a full refund.

**C.    The "Mezz" Investment**

52.    Plaintiff Dinnen's second investment in PdC was a $250,000 loan, which formed part of a round of financing that Defendants referred to as the mezzanine loan, mezzanine funds, or, simply, the "Mezz" (the "Mezz"), described further below.

53.    In approximately February 2012, there was a meeting with Plaintiff Dinnen and Defendants Flaherty, Kneen, and Vertuca, along with certain investors held at the offices of SV Capital.  At that meeting, the Defendants made a fundraising presentation.  The Defendants present at the meeting continued to portray the project as on track for profitable development and without issue. Also at the meeting, Defendants solicited an additional investment in the Sereno Project, the "Mezz". The Defendants said that funds raised through the Mezz would permit the acquisition of 11 acres of beachfront property adjacent to Sereno I, which is referred to herein as Sereno II. According to Defendants, this, in turn, would facilitate the vertical development (construction) of the first phase already contemplated and a second phase of villas as well. The Mezz investment was to bear interest at 15%, compounded quarterly, would have a term of 42 months, and would have payment priority over all member investments, including the Class A through D Units. In addition, Mezz investors as a whole would receive a portion of Defendants' 20% profits interest in the project.

54.    Defendants represented orally that they only needed $2 million to finish the project and that the Mezz would be, at most, a six month to one year deal.  The loan would be secured by a first position lien on the property.

55.     This time there was no private placement memorandum, subscription agreement or other document in which Defendants made disclosure of material information or risk factors. In addition to the above, the Defendants told Plaintiff Dinnen, among other things, the following, which they knew to be misleading:

a.     The money would be used to purchase the Sereno II property and that the money raised through the Mezz would be sufficient to buy the Sereno II property, including paying off all indebtedness;

b.     Mezz lenders would be given notice of, and have input into, the use of the Mezz fund;

c.     PdC had $12 million in construction financing readily available, an amount sufficient, along with construction progress payments for already pre-sold villas, to complete construction of all phases of the Sereno Project; and

d.     The Mezz financing would be limited to $2 million.

56.     In addition, none of the Defendants disclosed, among other things, the following material information:

a.     Any of the withheld information regarding the project or the information regarding SV Capital identified in the Paragraphs above, including Paragraph 40;

b.     PdC lacked sufficient funds to pay debt secured by the Sereno II property, which debt was in default and subject to litigation;

c.     Any concrete financial information regarding the project, including fees paid and payable to SV Capital (approximately $1.3 million) or another group called the RED group (approximately $3 million);

d.      A limited liability company owned and controlled by Defendants, TMTBC, LLC, was in the process of borrowing $3,000,000 from McElroy Holdings, LLC guaranteed by Defendants Flaherty, Roberts and Kneen ($1,000,000 each) (the "McElroy Loan") which would be counted as on par with, or superior in, repayment priority to the Mezz financing;

e.      Hotusa had a lien on, or a secured interest in, the Sereno II property in the amount of approximately $5.6 million that would not be satisfied at closing. Hotusa was suing the owner of the Sereno II property for nonpayment. The Defendants had chosen not to pay Hotusa, but, instead, to litigate the claim of Hotusa in an effort to reduce the amount owed to Hotusa;

f.      An adverse outcome in the foregoing litigation could greatly increase the amount of the Hotusa lien, and jeopardize the ability to develop Sereno or sell the underlying property and repay the Mezz investments and B Units interests;

g.      The Defendants still did not have the required permits/authorizations to build even Phase 1 of Sereno;

h.      Money flowing through PdC by some or all of the Defendants had been used by the Defendants to repair, maintain and improve their Beach House;

i.      Approximately $2 million in investor money had been used to fund the Defendants extravagant "marketing, travel, living" and other personal expenses;

j.      Investor money had been used to build and operate the restaurant in Playa del Carmen; and

l.      That the Defendants, or some of them, could choose to buy out certain investors' investment without repaying all investors.

57.      On May 2, 2012, Flaherty emailed Plaintiff Dinnen to say, "We have 1.25mm raised for tomorrow wiring, have room for 250k at attractive rates. Also have governance dealt with appropriately. Let me know if you want to discuss in the am. Cheers Tim."

58.      On May 9, 2012 Defendants circulated by email the Letter Agreement; Terms of Loan Facility ("Letter Agreement"), attached as Exhibit F.  This Letter Agreement provided for the loan of up to $6 million to PdC through a vehicle described as "the RM Funding Group, LLC, a Colorado limited liability company."  This Letter Agreement contained the following provisions:

a.      Proceeds from the "Facility" will used by PdC and its subsidiaries to fund the purchase of the Sereno II property and working capital requirements;

b.      "The Facility shall carry a return coupon equal to fifteen percent (15%) per annum interest (compounded quarterly) payable from the date of infusion until return in full of all principal and interest; provided, however, in the event that the initial funding of $1.5 million occurs on or before May 9, 2012, then such initial funding shall carry a return coupon equal to twenty-five percent (25%) per annum interest (compounded quarterly) payable from the date of infusion until return in full of all principal and interest"; and

c.      "This Letter shall be governed by and construed under the laws of Colorado without regard to principles of conflict of laws. The Parties irrevocably consent to the jurisdiction and venue of the state and federal courts located in the City and County of Denver, in connection with any action."

59.     The Letter Agreement also included a "capital waterfall" purporting to describe the order of priority for payments to PdC.   This "capital waterfall" failed to disclose the existence of any senior creditors, including HotUSA, whose loans would have priority over the "Facility" and the "Mezzanine Facility."   The omission of the HotUSA lien on the Sereno II property, which was a potentially multimillion dollar secured obligation senior to the Mezz, was a material misstatement.   The Letter Agreement identifies specific banks and funds that might be the source of future financing, giving the false impression that there was an understanding with those banks that would lead to an extension of credit.

60.     On the basis of this Letter Agreement, Plaintiff Dinnen wired $250,000 to PdC on May 9, 2012.

61.     This investment was originally sold to Plaintiff Dinnen as a simple loan, secured by the Sereno II Property, but, after Mr. Dinnen had already wired the money, Defendants presented him with a set of seven contracts that laid out a transaction structure where Mr. Dinnen would have an equity interest in a single purpose LLC, RM Funding LLC ("RM Funding"), wholly controlled by Defendants, and RM Funding would then make a loan to PdC.

62.     RM Funding has no independent existence and should be disregarded.   It was created for the sole purpose of structuring a single lending transaction and conducts no other business and holds no assets besides its loan to PdC.   RM Funding may also have been used to provide an additional "Super-Mezz" loan, over the objection of Plaintiffs and other similarly situated investors.   RM Funding is controlled by Individual Defendants, who also control PdC. This control structure is laid out in its official documents and demonstrated through the regular operations of RM Funding, to the extent that it has operations.

63.     RM Funding has not observed corporate formalities.  The corporate formalities that it has failed to observe include a failure to register the LLC with the Secretary of State of Colorado, or with any other jurisdiction, until recently and after the present dispute arose. Defendants have also thus far refused to provide to Plaintiff Dinnen executed copies of RM Funding's foundational documents and his own subscription agreement, and it is not clear that such documents exist. Thus, as a vestigial organization, on information and belief, RM Funding has not held corporate meetings, maintained its own accounts or prepared reports in accordance with its Operating Agreement.

64.     The sole business purpose served by structuring this transaction through RM Funding, rather than as a direct loan, was to ensure that the same managers and directors who controlled the debtor, PdC, also controlled the creditors and could prevent them from exercising the remedies that they would otherwise have against PdC. Treating RM Funding as a disregarded entity would protect the reasonable expectations of investors that they would have a remedy in the event of a debt default and serve the interests of justice.

65.     On May 25, 2009, Tom Bove at SV Capital sent Plaintiff Dinnen execution versions of contractual documents regarding the Mezz financing.

**D.     After the Mezz Investments**

66.     Defendants continued to send regular, upbeat communications to investors throughout the following period.  For example, on April 12, 2013, they circulated a Sereno project newsletter announcing that "an important hurdle has been cleared at Sereno Riviera Maya: Our final environmental permits have been granted." "Pre-development site work,

including demo[lish]ing existing structures, clearing development sites, and dune restoration should begin in May."

67.     In approximately September of 2013, without prior notice to Plaintiffs, the Defendants "parted ways" with developer/manager SV Capital.  Plaintiffs were not informed that the Defendants had failed to timely pay SV Capital, that there were alleged debts in excess of $1 million dollars owed to SV Capital and SV Capital's agents and suppliers.

68.     This information was formally communicated to the investors in an email from Flaherty dated March 26, 2014, which stated that PdC had "parted ways" with SV Capital and hired someone named John Fair. Fair's plan, adopted by the Individual Defendants, was to switch to a club membership model. This email represented that they had a current permit to build 44 villas with 2-4 bedrooms.  It also represented that the sale of membership would be sufficient to pay off a $12 million construction loan, the Mezz, and the B Units.

69.     Defendants' "update" did not disclose the title problems with the Sereno II property (the reason for the end of the relationship with SV Capital), the unpaid fees to SV Capital, the incomplete permitting or the difficulties experienced in raising a loan.  *Id*.

70.     In August 2014, the Defendants held a conference call at which time they disclosed to Plaintiffs for the first time that the Sereno II property was involved in litigation with Hotusa at the time PdC acquired it.  Defendants said that the Hotusa lien was at $6 million and that the $6 million would have priority over the Mezz/RM Funding financing of the Sereno II property. Investors, including Plaintiff, were also told that PdC had lost the Hotusa litigation, resulting in a judgment and lien against the Sereno II property in the amount of approximately

$11 million. At that call/meeting, Defendants represented that the Mezz investors would recover their entire investment.

71.    On August 27, 2014, Defendants circulated a "preliminary budget" for 2014. This budget showed expenses for several different sets of litigation attorneys working on at least two separate matters, in addition to two other firms. These large anticipated legal fees and expenses were not disclosed prior to Plaintiff Dinnen's investment in the Mezz.

72.    Thus, August 2014 is the earliest date of discovery of the offenses giving rise to the claims set forth in this Complaint.

73.    Subsequent to the investor meeting, despite objection from several investors, Flaherty, Roberts, and Kneen disclosed they had made additional advances in the amount of approximately $600,000, which they referred to as "Super Mezz" financing, and which purports to carry an 18% interest rate that compounds quarterly. The Defendants claim the Super Mezz financing, made in the name of RM Funding, has repayment priority over all other investor funding, including the investments provided by Plaintiffs.

74.    Despite repeated demands, the Defendants have failed to account for the proceeds of the B Units and Mezz investments.

75.    The foregoing loans, offers, purchases and investments, including investments in the B Units and the Mezz financing, constituted "securities" within the meaning of the Exchange Act, 15 U.S.C. § 78c.

76.    PdC is responsible for the conduct of the Individual Defendants as each was at all times relevant hereto acting as an agent of PdC and each was acting within the scope of his duties as a member, officer, employee and/or manager of PdC.

77.     Individual Defendants, through their status as holders of voting Class A Interests in PdC and as Managers and directors of PdC, fully controlled PdC, including its documents and information.    During all times relevant to this Complaint, Individual Defendants were "controlling persons" within the meaning of § 20(a) of the Exchange Act.

## FIRST CLAIM FOR RELIEF
### Fraud
**(All Plaintiffs Against all Defendants)**

78.     Plaintiffs hereby incorporate all other Paragraphs of this Complaint as if fully set forth herein.

79.     As alleged in this Complaint, Defendants made oral and written representations to Plaintiffs with respect to their investments in PdC.

80.     Defendants' representations were false.

81.     Defendants made the representations with the intent to deceive Plaintiffs.

82.     Plaintiffs justifiably relied on Defendants' false representations.

83.     Plaintiffs' reliance on Defendants' representations resulted in damages.

84.     Defendants obtained the use and benefit of money, property or services, or an extension, renewal or refinancing of credit from Plaintiffs by their fraud, actual fraud and false representations.

85.     As a result, Plaintiffs have been damaged in amount to be proven at trial, and, in addition, are entitled to recover costs, reasonable attorneys' fees and pre- and post- judgment interest.

## SECOND CLAIM FOR RELIEF
### Negligent Misrepresentation
**(All Plaintiffs Against all Defendants)**

86.     Plaintiffs hereby incorporate all other Paragraphs of this Complaint as if fully set forth herein.

87.     Defendants gave false or inaccurate information to Plaintiffs regarding the Sereno Project and the referenced investments and securities.

88.     Defendants gave such information to Plaintiffs in the course of their business and professional relationship with Plaintiffs.

89.     The information was given to Plaintiffs for Plaintiffs' guidance and use in connection with the sale of the securities alleged above.

90.     Defendants were negligent in obtaining or communicating the information to Plaintiffs.

91.     Defendants gave the information to Plaintiffs with the intent or knowing that Plaintiff would act or decide not to act in reliance on the information.

92.     Plaintiffs relied on the information supplied by Defendants.

93.     Plaintiffs' reliance on the information supplied caused damage or injury to Plaintiffs in connection with the purchase of the investments and securities in an amount to be proven at trial and, in addition, Plaintiffs are entitled to recover costs and pre- and post-judgment interest.

## THIRD CLAIM FOR RELIEF
### Negligence
### (All Plaintiffs Against all Defendants)

94.     Plaintiffs hereby incorporate all other Paragraphs of this Complaint as if fully set forth herein.

95.     As part of Defendants' business and professional relationship with Plaintiffs, including Plaintiffs' investment in the referenced investments and securities, Defendants owed duties to Plaintiffs to not act negligently towards Plaintiffs.

96.     As a result of Defendants actions, Defendants were negligent in their dealings with Plaintiffs, in the management of Plaintiffs' monies and funds, and in management of the investments and securities referenced above. This negligence occurred in connection the collection of deposits with respect to the purchase and sale of the securities identified above.

97.     Defendants' negligence was a proximate cause of the damage and injury incurred by Plaintiffs in an amount to be proven at trial, and, in addition, Plaintiffs are entitled to recover costs and pre- and post- judgment interest.

## FOURTH CLAIM FOR RELIEF
### Misrepresentations and Omissions Under the Securities and Exchange Act
### (All Plaintiffs Against all Defendants)

98.     Plaintiffs hereby incorporate all other Paragraphs of this Complaint as if fully set forth herein.

99.     Under the stated facts and circumstances, Defendants, in connection with the offer or sale of B Units and Mezz investments, made untrue statements of material fact to Plaintiffs or made statements of fact that were materially misleading in light of the failure to disclose material facts necessary to make the statements made not misleading under the circumstances.

100.    Defendants' actions and inactions are in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission, 17 C.P.R.§ 240.10b-5, and were a proximate cause of damage or injury to Plaintiffs.

101.    Defendants are liable to Plaintiffs for the amount of consideration paid for the B Units and Mezz investment, along with interest, at the statutory rate from the date of payment, including costs and reasonable attorney fees.

**FIFTH CLAIM FOR RELIEF**
**Control Person Liability – B Units and Mezz Investment**
**(All Plaintiffs Against Individual Defendants)**

102.    Plaintiffs hereby incorporate all Paragraphs of this Complaint as if fully set forth herein.

103.    Individual Defendants, through ownership or otherwise, controlled PdC and other corporate, partnership or limited liability entities known and unknown to Plaintiffs. Individual Defendants are, and each is, a control person under § 20(a) of the Exchange Act.

104.    As a control person under the Exchange Act, each of the Individual Defendants is jointly and severally liable for rescission or damages with respect to the B Units and Mezz investments, together with interest, at the statutory rate, including reasonable attorney fees, with and to the same extent as the controlled persons.

**SIXTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT -- INVESTMENTS**
**(All Plaintiffs Against all Defendants)**

105.    Plaintiffs hereby incorporate all Paragraphs of this Complaint as if fully set forth herein.

106.     Defendants received a benefit from Plaintiffs from the investment in securities because of their misconduct, as set forth more fully above.

107.     Defendants continue to retain and enjoy that benefit.

108.     Under the facts and circumstances set forth in this Complaint, it would be inequitable to allow Defendants to retain the benefit conferred on them to the detriment of Plaintiffs. Defendants' refusal to return the benefit to Plaintiffs has damaged Plaintiffs in the amount of Plaintiffs' investments in the B Units and Mezz securities, plus pre- and post-judgment interests and costs.

**SEVENTH CLAIM FOR RELIEF**
**Civil Conspiracy**
**(All Plaintiffs Against all Defendants)**

109.     Plaintiffs hereby incorporate all Paragraphs of this Complaint as if fully set forth herein.

110.     Defendants with each other and with persons known to Defendants but unknown to Plaintiffs, agreed, by words or conduct, to accomplish an unlawful goal through unlawful means, including the fraud and unlawful sale of securities as set forth above.

111.     That agreement was furthered by one or more unlawful, overt acts intentionally performed by the conspirators, including accepting payment for B Units and Mezz investments as set forth above.

112.     As a result of the actions of Defendants, Plaintiffs have suffered, and continues to suffer, damages in an amount to be proven at trial, plus interest, costs and reasonable attorneys' fees.

**EIGHTH CLAIM FOR RELIEF**
**Request for Accounting**
**(All Plaintiffs Against Defendant PDC)**

113.    Plaintiffs hereby incorporate all Paragraphs of this Complaint as if fully set forth herein.

114.    Defendants have acted as managers of the Sereno Project and the investment programs set forth above.

115.    Defendants are in possession of information regarding the sources and uses of funds related to the B Units and Mezz investments.

116.    Despite demand, Defendants have refused to provide a documented accounting of the sources and uses of funds related to the Sereno Project.

117.    Plaintiffs request Defendants be ordered to provide a detailed written accounting of the uses, proceeds and status of the Sereno Project, including deposits and proceeds of B Units and Mezz investments.

118.    Plaintiffs further request that Defendants be ordered to provide all pertinent documentation supporting the accounting.

**Prayer for Relief**

WHEREFORE, Plaintiffs request that this Court enter an order and judgment in Plaintiffs' favor and as against Defendants as follows:

A.    An award of damage in an amount to be proven at trial;

B.    Rescission;

C.    For Plaintiffs' costs, including expert witness fees, pre- and post-judgment interest and reasonable attorneys' fees;

D.      For an accounting to Plaintiffs of The Sereno Project, including all deposits and

invested funds; and

E.      For such other and further relief as this Court deems just and proper.

**JURY TRIAL REQUESTED ON ALL CLAIMS AND ISSUES SO TRIABLE**

Respectfully submitted this 19th day of April, 2016.

By */s/ Amber J. Munck*_____
Amber J. Munck, #39531
Harriet McConnell, #44958
GREENBERG TRAURIG, LLP
1200 17th Street, Suite 2400
Denver, Colorado 80202
Telephone: (303) 572-6500
Facsimile:  (303) 572-6540
E-Mail:    muncka@gtlaw.com
mcconnellh@gtlaw.com

*Attorneys for Plaintiffs*

Plaintiff Dinnen's Address:
4 Glenmoor Circle
Cherry Hills Village, CO 80113

Plaintiff JAKS Address:
10 West End Avenue, Suite 9C,
New York, NY 10023

*DEN 99059329v2*