IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 16-cv-00882-PAB-STV

MICHAEL W. DINNEN, an individual,

      Plaintiff,

v.

TIMOTHY KNEEN, an individual,
MICHAEL ROBERTS, an individual,
TIMOTHY FLAHERTY, an individual,
CARL VERTUCA, an individual, and
PdC, LLC, a Colorado LLC,

      Defendants.

---

**ORDER**

---

    This matter is before the Court on Defendant's [sic] Motion to Dismiss Claims in

Amended Complaint [Docket No. 59].[1]  The Court has jurisdiction pursuant to 28 U.S.C.

§ 1331.

## I. BACKGROUND[2]

    The claims in this action arise from allegedly false and misleading statements

made by defendants PdC, LLC, Timothy Kneen, Michael Roberts, Timothy Flaherty,

---

    [1]Defendants' motion was originally filed on behalf of defendants PdC, LLC,
Timothy Kneen, Timothy Flaherty, and Carl Vertuca.  *See* Docket No. 59.  On October
24, 2016, defendant Michael Roberts filed a notice of joinder in the motion to dismiss.
Docket No. 60.

    [2]The facts below are taken from plaintiff's amended complaint, Docket No. 55,
and are presumed to be true for purposes of this motion to dismiss.

and Carl Vertuca ("defendants") to induce plaintiff to invest in a luxury real estate project in Mexico.[3]  Docket No. 55 at 1, ¶ 1.

Plaintiff is an investor in defendant PdC, LLC ("PdC").[4]  *Id*. at 1, ¶ 1. Plaintiff met defendants Flaherty and Kneen in 2007.  *Id.* at 6, ¶ 22.  In 2008, plaintiff attended a pitch for the development of a beachfront resort on Xpu-Ha Beach near Playa del Carmen to be called the Sereno Beach Resort (the "Sereno project").  *Id.* at 4, ¶ 12; 6-7, ¶ 22.  Defendants told plaintiff at the pitch that by investing in the Sereno project he could double his money.  *Id.* at 6-7, ¶ 22.  In the summer of 2008, plaintiff attended a meeting in Denver where defendants made "representations concerning the use and scope of the Sereno Project as well as the safety of the investment."  *Id.*, ¶ 26.  At a sales presentation in 2010, plaintiff was told "that their investment was 'safe' and would result in a doubling of their money."  *Id.*, ¶ 23.  Defendants Flaherty, Kneen, and Roberts participated in the 2010 sales presentation.  *Id.*

At some point before February 2009, defendants began offering "B Units" in PdC.  *Id.* at 8, ¶ 27.  On or about February 2, 2009, defendant PdC provided plaintiff with a Private Placement Memorandum ("PPM") describing the B Units offering.  *Id.*, ¶ 28.  The PPM described an offering of B Units that were eligible for a return of up to

---

[3]At the time defendants filed their motion to dismiss, plaintiffs Jaks Holdings, LLC and David Adkins were parties to this case.  On May 16, 2017, those plaintiffs filed a notice of voluntary dismissal and were dismissed.  *See* Docket Nos. 76, 77.  Accordingly, the Court considers defendants' motion as it relates to plaintiff Michael Dinnen's claims.

[4]Some of the actions in the amended complaint were taken by PdC's Mexican subsidiary, Riviera Country Club S de R.L. de C.V., which is 99% owned by PdC and 1% owned by a related company.  Docket No. 55 at 6, ¶ 18.  The Court refers to both entities as "PdC" for clarity.

"one times" the capital contribution, subject to the repayment of "bank loans and other administrative payments and reserves." *See* Docket No. 55-1 at 8. The PPM included a table of financial projections that provided a list of certain anticipated expenses. *See id.* at 12-14. The amended complaint states that these financial projections were "knowingly misleading, inaccurate or prepared with reckless disregard for accuracy." Docket No. 55 at 10, ¶ 41. The investment proceeds from the offering of B Units were to be used for a number of purposes, including the development of the Sereno project. *Id.* at 8, ¶ 31.

In promoting the B Units, defendants Kneen and Flaherty represented that "[w]ithin 18-24 months, the investment would double in value" and that "[c]onstruction was to begin immediately and everything was ready to go." *Id.* at 12, ¶ 46. According to the amended complaint, defendants did not disclose that the planned development exceeded permitting requirements, that investment proceeds would be used for projects unrelated to the Sereno project, and that PdC lacked government permission for the project. *Id.* at 13, ¶ 48. Plaintiff invested in the B Units in 2009.[5] Docket No. 55 at 1-2, ¶ 1; 8, ¶ 28.

After plaintiff invested in the B Units, defendants provided numerous updates related to the status of the project. *Id.* at 14-15, ¶ 53. In April 2010, defendants stated that they had received a final environmental permit. *Id.* On October 13, 2010,

---

[5]The chronology in the amended complaint states that plaintiff invested in the B Units in 2008-2009. Docket No. 55 at 1-2, ¶ 1. However, the amended complaint also states that defendants began offering the B Units in February 2009 and provided plaintiff with the PPM on or about February 2, 2009. *Id.* at 8, ¶¶ 27-28. Accordingly, the Court presumes that plaintiff did not invest in the B Units until after February 2, 2009.

defendants stated that the Sereno project had been granted "the last permit by the City for the . . . Villas." *Id.* The October 13, 2010 email included as an attachment a remodel permit, not a permit for new construction. *Id.*

Some time before December 2010, defendants informed plaintiff that PdC had partnered with SV Capital, a firm with experience developing projects like the Sereno project. *Id.* at 16, ¶ 55. However, at some point before 2014, SV Capital informed defendants that the Sereno project could not be completed as planned. *Id.*

In 2011, plaintiff gave PdC $120,106 towards the purchase of a villa. *Id.* at 17, ¶ 58. Plaintiff has received a partial refund of this deposit.

In February 2012, plaintiff and other potential investors met with defendants Flaherty, Kneen, and Vertuca. *Id.* at 18, ¶ 61. Defendants offered plaintiff the opportunity to participate in a second round of financing referred to as the mezzanine loan or "the Mezz." *Id.* at 8-14, ¶¶ 27-48; 17-23 at ¶¶ 60-73. Defendants represented that the Mezz "would permit the acquisition of 11 acres of beachfront property." *Id.* The second property ("Sereno II") was adjacent to the beachfront property already owned by PdC ("Sereno I"). *Id.*

In offering the Mezz, defendants did not disclose, among other things, that the Sereno II property was subject to a lien filed by Hoteles Turisticos Unidos, S.A. ("Hotusa"), that defendants had other financial difficulties, that defendants still had not obtained permits to develop Sereno I, or that investor money was being used to pay for defendants "marketing, travel, living." *Id.* at 19-20, ¶ 64. On May 9, 2012, defendants emailed a letter agreement and letter of intent to plaintiff regarding investment in the

Mezz, to be made to PdC through a "vehicle described as 'the RM Funding Group, LLC.'" *Id.* at 21, ¶ 66. Plaintiff wired $250,000 to PdC after receiving the letter agreement. *Id.* at 22, ¶ 68.

Shortly after plaintiff wired his funds to PdC, defendants provided plaintiff with seven contracts "that laid out a transaction structure [of the Mezz] where Mr. Dinnen would have an equity interest in a single purpose LLC, RM Funding LLC." *Id.* at 22, ¶ 69.

After the Mezz offering, defendants continued to offer upbeat assessments of the Sereno project. *Id.* at 23-24, ¶ 74. In August 2014, defendants held a conference call wherein they disclosed that PdC had been involved in unsuccessful litigation with Hotusa regarding the Sereno II property, resulting in a $6,000,000 lien on the Sereno II property with priority over the Mezz funding. *Id.* at 24-25, ¶ 78. Defendants have yet to obtain permits to develop the Sereno project, and plaintiff states that he has not "received a single penny" from his investments. *Id.* at 1-2, ¶ 1.

On April 19, 2016, plaintiff filed suit. Docket No. 1. Plaintiff's amended complaint, filed on October 4, 2016, contains eight claims for relief: fraud; negligent misrepresentation; negligence; misrepresentations and omissions in violation of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78a, et seq.; control person liability under the Exchange Act; unjust enrichment; civil conspiracy; and a request for an accounting. Docket No. 55.

## II. LEGAL STANDARD

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted). At the same time, however, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) (omission marks, internal quotation marks, and citation omitted). The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible. *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either

direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

## III.  ANALYSIS

### A.  Plaintiff's Section 10(b) Claim (Fourth Claim for Relief)

Under Section 10(b) of the Exchange Act, it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 provides that it is unlawful for any person

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that defendants (1) in connection with the purchase or sale of a security, (2) "made an untrue statement of material fact, or failed to state a material fact," (3) with scienter; and (4) "that plaintiff relied on the misrepresentation, and sustained damages as a proximate result of the misrepresentation."  *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996) (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)).  A representation or omission is material "'if a reasonable investor would consider it important in determining whether to

buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors."  *City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (quoting *Grossman v. Novell, Inc.,* 120 F.3d 1112, 1119 (10th Cir. 1997)).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4, in order to stem abuses in private securities fraud suits, *Fleming Companies,* 264 F.3d at 1258-59 (citing H.R. Rep. No. 104-369, at *31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730); *see also* 15 U.S.C. § 78u-4, and "to discourage frivolous litigation."  H.R. Rep. No. 104-369, at *32.  In addition, it was meant to "protect[] outside directors, and others who may be sued for non-knowing securities law violations, from liability for damage actually caused by others."  *Id.*  The Conference Committee recognized "the need to reduce significantly the filing of meritless securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims."  *Id.* at *39.  In order to meet this need, Congress sought to establish a "[h]eightened pleading standard."  *Id.* at *41.

The PSLRA amended the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq., and the Securities Exchange Act of 1934 to impose specific and more stringent pleading requirements on complainants alleging securities fraud under Section 10(b).  *See id.; Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).  In order to satisfy the pleading requirement of the PSLRA, plaintiff must "specify each statement alleged to have been misleading," why the statement is misleading, and, regarding each act or omission, "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind." *See* 15 U.S.C. § 78u-4(b)(1) and (2) (1995). According to the Supreme Court, "courts must consider the complaint in its entirety . . . [in order to determine] whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter*." Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322-23 (2007) (citations omitted).

"The term 'scienter' has been defined by the Supreme Court of the United States as 'a mental state embracing intent to deceive, manipulate, or defraud." *Fleming Companies*, 264 F.3d at 1258 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)). Analyzing the text of the Exchange Act, the Supreme Court concluded that "[t]he words 'manipulative or deceptive' used in conjunction with 'device or contrivance' strongly suggest that [§] 10(b) was intended to proscribe knowing or intentional misconduct." *Ernst & Ernst*, 425 U.S. at 197 (citations omitted). The scienter requirement for Section 10(b) also can be met by alleging facts constituting "[r]ecklessness, defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Fleming Companies*, 264 F.3d at 1258 (quoting *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir. 1996)).

In order "to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *Fleming Companies*, 264 F.3d at 1261.

The Tenth Circuit has emphasized that "'it is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing.'" *Id.* at 1260-61 (emphasis in original) (quoting with approval *Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989)).

### 1. Whether Plaintiff's Investment in the Mezz was a "Security"

In order to state a claim under Section 10(b) and Rule 10b-5, defendants must have made fraudulent statements "in connection with" the purchase or sale of a security. 17 C.F.R. § 240.10b-5; *Anixter*, 77 F.3d at 1225. For a deceptive act to have a connection with the purchase or sale of a security, there must be "a causal connection between the allegedly deceptive act or omission and the alleged injury." *Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996). Accordingly, a fraudulent statement that occurs after the purchase or sale of a security does not constitute a violation of Section 10(b) or Rule 10b-5. *Id.* ("[T]here is no [] causal relationship between the alleged deception by Defendants and any harm [because the] allegedly deceptive practice . . . occurred *after* the sale.") (emphasis in original); *see also Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1326 (7th Cir. 1989) (holding that a false representation was immaterial because it postdated the purchase of a stock); *LBS Petroleum, LLC v. Demir,* 2015 WL 12469064, at *9 (S.D. Fla. Oct. 28, 2015) ("email updates . . . following an investment are clearly not made in connection with the sale or purchase of a security"); *Rozanski v. Fleet Bank of New York*, 1996 WL 365685, at *5 (N.D.N.Y. June 24, 1996) ("The 'in connection with' requirement is not

satisfied if the alleged fraud or misstatement occurred after the purchase or sale of securities.") (citation omitted).

Plaintiff claims that defendants made false statements of fact in connection with the offer and sale of the B Units and the Mezz. Docket No. 55 at 28, ¶ 107. The Court will first consider defendants' allegedly false statements regarding the Mezz.

Defendants dispute plaintiff's claim that the Mezz constitutes a security. Docket No. 59 at 39-41. Under the Exchange Act, the term "security" means "any note, stock, treasury stock, . . . bond, . . . any instrument commonly known as a 'security.'" 15 U.S.C. § 78c(10). "[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).

The parties' dispute over whether the Mezz constitutes a security is affected by the parties' briefing on the motion to compel arbitration. *See* Docket Nos. 16, 29, 37. In response to defendants' arbitration motion, plaintiff alleged that, before he provided additional funds to defendants in response to their Mezz solicitation, defendants provided him with a letter agreement and letter of intent, Docket No. 29 at 2, which described plans to loan up to six million dollars to PdC and its subsidiaries from a yet-to-be-named lending entity. *See* Docket No. 29-1 at 2. The letter of intent states that it is contingent upon subsequent "approval by the Company." *Id.* at 2. The letter of intent does not solicit funds or describe the rights of individuals who were to contribute to the lending entity. *See* Docket No. 29-1.

In reliance on the letter of intent and letter agreement, plaintiff wired $250,000 to defendants. Docket No. 29 at 2-3. On May 9, 2012, after plaintiff wired the $250,000,

11

"[d]efendants presented him with a set of seven contracts that laid out a transaction structure where Mr. Dinnen would have an equity interest in . . . RM Funding LLC," which would loan the Mezz funds to PdC.[6]  Docket No. 55 at 22, ¶ 69.  In addressing the motion to compel arbitration, plaintiff stated that "he cannot recall whether or not he executed" the agreements sent to him on May 9th after he wired his money.  Docket No. 29 at 6-7 n.2.  Plaintiff further represented to the Court that he will not seek to enforce any rights under these documents and instead "***seeks to enforce his rights under the Letter of Intent***."  *Id.* at 7 (emphasis in original).  As the Court previously noted, plaintiff is bound by these representations.  Docket No. 69 at 10.

As defendants pointed out in the briefing on the arbitration motion, the letter of intent "only addresses rights between RM Funding and PdC; it has no bearing on the rights of those who contribute funds to the [Mezz]."  Docket No. 37 at 5.  Moreover, defendants noted that, because the letter of intent is not an agreement between plaintiff and defendants, plaintiff "either has rights . . . as a member of RM Funding, . . . or he has no such rights . . . and has simply provided funds to PdC without any documentation."  *Id.*

---

[6]The Amended Complaint states that the letter agreement is attached as Exhibit F.  Docket No. 55 at 21, ¶ 66.  It does not appear, however, that the letter agreement was attached.  Plaintiff attached the letter agreement to his response to the motion to compel arbitration.  Docket No. 29-2.  Because the complaint relies on the terms of the letter agreement, the Court considers whether its terms support plaintiff's claim.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) ("When a complaint refers to a document and the document is central to the plaintiff's claim, the plaintiff is obviously on notice of the document's contents, and this rationale for conversion to summary judgment dissipates.")

Based on plaintiff's disclaimer of any intent to enforce rights under the documentation sent to him after he wired his money, plaintiff's only remaining contractual rights with respect to his $250,000 contribution to the Mezz are his rights arising out of the letter of intent between RM Funding and PdC. Plaintiff has no standing to enforce the letter of intent, *see O'Connor v. R.F. Lafferty & Co.*, 965 F.2d 893, 901 (10th Cir. 1992) (only intended beneficiaries have standing to enforce agreements between third parties), and the letter of intent contains no reference to the rights of individuals who provide funds as part of the Mezz. *See* Docket No. 29-1. A "security" is characterized by "an investment of money in a common enterprise with profits to come solely from the efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975) (citation omitted). The Court is not aware of any authority supporting the proposition that contributing funds based on a letter of intent between third parties can constitute a security. Thus, the Court finds that plaintiff's $250,000 contribution to defendants is not a "security" within the meaning of the Exchange Act.

Accordingly, plaintiff does not have a claim under Section 10(b) or Rule 10b-5 for misrepresentations with respect to his investment in the Mezz.

### 2. *Whether Plaintiff Has Met PSLRA Pleading Standards*

Defendants argue that plaintiff's federal securities act claim (the fourth claim) regarding the B Unit offering should be dismissed because plaintiff has failed to meet the pleading requirements of the PSLRA. Docket No. 59 at 14-39.

Courts in the Tenth Circuit approach a claim under the PSLRA by "evaluating the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or

misleading." *Adams*, 340 F.3d at 1099 (citing with approval *Novak v. Kasaks*, 216 F.3d 300, 313-314, 314 n.1 (2d Cir. 2000)). This approach involves an evaluation of the following factors:

> (1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading.

*Adams*, 340 F.3d at 1099 (citing *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002)). If an analysis of these factors leads to the conclusion that a "reasonable person" would find the defendants' statements to be false or misleading, "the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *Adams*, 340 F.3d at 1099. Although whether or not the source of the plaintiff's knowledge is disclosed "can significantly strengthen the[] pleading," a plaintiff's complaint need not "always identify the source, either personal or documentary, of the facts alleged." *Id.* at 1102.

Plaintiff identifies five broad categories of misrepresentations that he has sufficiently alleged are false: first, defendants "repeatedly assured" plaintiff that his investment was safe and that he would double his money; second, defendants provided a "largely fictitious table" of financial projections related to the project in the PPM; third, defendants sent an email on April 14, 2010 that contained numerous false representations; fourth, defendants failed to disclose that the project could not be built as designed; fifth, during the Mezz, defendants did not disclose the existence of the

Hotusa lien; and, sixth, defendants misrepresented the permits they had obtained related to the project.  Docket No. 65 at 18-22.

As to the first category, defendants' assurances that the investment was safe, the amended complaint states that in 2008 defendants Flaherty and Kneen met with plaintiff and told him that, if he invested in the Sereno project, he would double his money.  Docket No. 55 at 6-7, ¶ 22.  Similar statements were made during a golf trip in 2010.[7]  *Id.* at 7, ¶¶ 23-26.  "Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions."  *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).  Statements regarding expected growth, expected sales, and other predictions related to fiscal success are regularly held to be non-actionable puffery.  *See id.* at 1120 (citing cases).  Defendants' statement that plaintiff would double his money is mere puffery and no reasonable investor would rely on such representations.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1340 (10th Cir. 2012) ("These are all the 'kind of rosy affirmation[s] commonly heard from corporate managers and numbingly familiar to the marketplace – loosely optimistic statements that are so vague, so lacking in specificity . . . that no reasonable investor could find them important.") (quoting *Ind. State Dist. Council of Laborers and Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009)).

---

[7]Because plaintiff had already invested in the B Units by 2010, defendants' representations at that time would not constitute securities fraud.  *See Arst*, 86 F.3d at 977.

The second category of actionable statements identified by plaintiff comes from the PPM that defendants provided to plaintiff on or about February 2, 2009. *See* Docket No. 55 at 8-10, ¶¶ 27-41. In his response brief, plaintiff complains that the "Financial Projections" and "Cash Flow Projects" contained in the table at the end of the PPM contained "dishonest near-term cost estimates." Docket No. 65 at 19. Plaintiff alleges that these estimates created a "false impression of precision" while omitting costs that were reasonably ascertainable. *Id.* Although plaintiff claims that these statements created the impression of genuine budget materials "used by the Management for actual planning purposes," Docket No. 65 at 20, plaintiff acknowledges that the PPM stated that the "Financial Projections or forecasts . . . must be viewed only as estimates." *Id.* at 19-20. Moreover, plaintiff fails to show how the amended complaint alleges these estimates' falsity. The Court finds that plaintiff has failed to adequately plead their falsity under the PSLRA.

More generally, the amended complaint states that the PPM contained false statements, omitted relevant information, and included misleading financial projections. Docket No. 55 at 9-10, ¶¶ 34-41. For example, the amended complaint states that "PdC never had a legal right to develop the Sereno I property . . . Defendants knew at the time they made these statements that they were materially false and misleading." *Id.* at 9, ¶ 35. The PPM, however, does not state that defendants had the right to develop the Sereno I property. Rather, the PPM provides that the development of the project may not occur at all due to "delays in obtaining necessary licenses, permits or approvals from government agencies." Docket No. 55-1 at 17. A reasonable investor

would not find the PPM to be misleading as to PdC's right to develop the Sereno I property.

The amended complaint also states that the PPM failed to disclose that funds from B Units would be used to pay for defendants' expenses for using the Beach House or other personal/business trips. Docket No. 55 at 9, ¶ 36. As plaintiff was aware, *id.* at 6, ¶ 22, the Beach House was used for marketing and plaintiff provides no basis to establish the materiality of any nondisclosure regarding marketing that was apparently known and expected for this type of development. Plaintiff also does not present any facts suggesting that defendants deliberately concealed travel expenses in order to mislead investors or that the travel expenses represented a significant expense that would have affected investor decision-making. *Id.*

The amended complaint states that the PPM failed to disclose a first lien on the Sereno II property in favor of Hotusa. Docket No. 55 at 9, ¶ 37. The PPM stated that there was a possibility that the company would pursue development of an adjacent property. Docket No. 55-1 at 24. The PPM noted that such a development was "not currently part of our business plan." *Id.* Because the development of the Sereno II property was outside the scope of the development at the time plaintiff invested in the B Units, any information related to that property was not material. Moreover, the PPM's only affirmative representation with respect to the property was that PdC "currently has executed a Promissory Purchase Agreement with the owner of the [adjacent property]." *Id.* Plaintiff does not allege that this representation was false. *See* Docket No. 55 at 9, ¶ 34.

The amended complaint states that the PPM was misleading because it "did not clearly disclose any permitting costs, regulatory compliance costs, or fees for professional services." *Id.* at 10, ¶¶ 39-41. Accounting irregularities, standing alone, do not state a claim for securities fraud. *Fleming Companies*, 264 F.3d at 1261. Moreover, plaintiff must pair his allegations with evidence that the lack of clear disclosures was the result of defendants' fraudulent intent. *Id.* There is no support in the amended complaint for plaintiff's claim that the Financial Projections were intended to mislead. The two pages of summary financial data are labeled as unaudited and represent estimates related to the project. *See* Docket No. 55-1 at 12-13. In addition, apart from a claim that defendants "had concrete information" related to a contract with Oz Architecture, the amended complaint does not specify which expenses defendants should have included in their financial projections. Docket No. 55 at 10, ¶¶ 39-40. The PPM disclosed the contract with Oz Architecture, so a reasonable investor would have anticipated expenses arising from that relationship. Docket No. 55-1 at 23. Accordingly, plaintiff's allegations regarding the content of the PPM do not demonstrate strong evidence of fraudulent intent.

The third category of misrepresentations noted by plaintiff, those contained in the April 14, 2010 email, is irrelevant to plaintiff's claim.[8] *See* Docket No. 55 at 12-13, ¶ 47. The amended complaint does not allege that the email was sent to plaintiff or that he was otherwise made aware of its contents. *Id.* Even if the email was sent to plaintiff,

---

[8]The amended complaint also refers to a January 12, 2009 email sent to JAKS member James Deighan. Docket No. 55 at 10-11, ¶ 42. The amended complaint does not allege that plaintiff was made aware of the contents of that email.

plaintiff invested in the B Units in 2009. Docket No. 55 at 1-2, ¶ 1; 8, ¶ 28. Accordingly, defendants' alleged misrepresentations in 2010 are irrelevant to plaintiff's decision to invest in the B Units. *See Arst*, 86 F.3d at 977.

The fourth category of alleged misrepresentations and omissions concerns defendants' permitting difficulties. Docket No. 65 at 21. The amended complaint states in several places that defendants failed to disclose the fact that they did not have permits. *See, e.g.,* Docket No. 55 at 9-11, ¶¶ 35, 39, 43; 13, ¶ 48. However, while the amended complaint states that defendants had been advised of permitting difficulties, *see, e.g., id.* at 13, ¶ 48, the amended complaint does not state when defendants learned of the difficulties in obtaining permits. The PPM, which was provided to plaintiff prior to his investment, expressly acknowledged potential challenges with respect to permitting. Docket No. 55-1 at 17. While the amended complaint refers to specific false statements related to defendants' possession of permits, *see, e.g.,* Docket No. 55 at 14-15, ¶ 53, none of those communications was sent to plaintiff before his decision to invest in the B Units.

The fifth category of misrepresentations, those related to the Hotusa litigation, was, according to plaintiff, made "during the Mezz financing." Docket No. 65 at 21. Plaintiff's $250,000 loan was not part of the Mezz and did not constitute a security. Accordingly, plaintiff must allege that the misrepresentations related to the Hotusa litigation were made in connection with his investment in the B Units. There was no lawsuit and PdC had no interest in the Sereno II property at the time that plaintiff invested in the B Units. *See* Docket No. 55 at 14, ¶¶ 49-50. Because PdC could not have disclosed the Hotusa litigation at the time plaintiff invested in the B Units,

defendants did not violate the securities laws by failing to inform plaintiff of the Hotusa litigation. *Fleming Companies*, 264 F.3d at 1260 ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

Last, plaintiff states that, throughout the project, defendants made repeated misrepresentations regarding permitting for the Sereno Project. Docket No. 65 at 22. The amended complaint identifies specific communications that were allegedly false or misleading with respect to defendants' permits. *See*, *e.g.,* Docket No. 55 at 12-13, ¶¶ 46-47. However, none of these communications occurred before plaintiff's investment in the B Units in 2009. The earliest communication containing a specific representation about permits occurred in April 2010. *Id.* at 14-15, ¶ 53. These representations did not induce plaintiff to purchase a security and therefore do not fall under the protections of Section 10 of the Exchange Act or Rule 10b-5. *See Arst*, 86 F.3d at 977. At the time plaintiff made his investment, the PPM he received from defendants stated that the project may "fail to obtain, or may experience material delays in obtaining, government approvals required by our business." Docket No. 55-1 at 18.

Considering the complaint as a whole, plaintiff has failed to allege that defendants made false or misleading statements in connection with plaintiff's investment in the B Units. While defendants may have engaged in misrepresentation in the years following plaintiff's decision to invest, those misrepresentations are not actionable under the provisions of the Exchange Act relied upon by plaintiff.

The Court finds that plaintiff has failed to state a claim for a violation of Section 10(b) and Rule 10b-5 and plaintiff's fourth claim for relief will be dismissed.

## B.  Control Person Liability (Fifth Claim for Relief)

Plaintiff's fifth claim for relief alleges that the individual defendants are jointly and severally liable for damages related to the B Units and the Mezz investment under § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  Docket No. 55 at 29, ¶¶ 110-12.  In order to state a claim under § 20(a), plaintiff must establish "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person."  *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998). Because plaintiff's claim fourth claim for relief will be dismissed, plaintiff has failed to allege a primary violation of the securities laws and his fifth claim for relief will be dismissed as well.

## C.  Plaintiff's State Law Claims

Plaintiff's remaining claims for relief are brought under state law.  Where "the bases for federal subject matter jurisdiction have been extinguished . . . the district court may decline to exercise . . . supplemental jurisdiction over plaintiff's state claims."[9] *Lancaster v. Indep. Sch. Dist. No. 5*, 149 F.3d 1228, 1236 (10th Cir. 1998); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction.").

The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.  As a result, plaintiff's first, second, third, sixth, seventh, and eighth claims for

---

[9]Plaintiff does not claim that there is diversity jurisdiction in this case.  And, in fact, there does not appear to be complete diversity between the parties as required by 28 U.S.C. § 1332. *See* Docket No. 55 at 3-4, ¶¶ 2, 5-8 (noting that plaintiff and all of the individual defendants live in Colorado).

relief will be dismissed.  *See* Colo. Rev. Stat. § 13-80-111 (permitting claims properly commenced within the statute of limitations to be re-filed if involuntarily dismissed because of lack of jurisdiction); *Dalal v. Alliant Techsystems, Inc.*, 934 P.2d 830, 834 (Colo. App. 1996) (interpreting 28 U.S.C. § 1367(d) as tolling the statute of limitations while claim is pending in federal court); *see also Artis v. District of Columbia,* 135 A.3d 334 (D.C. 2016)*, cert. granted*, --- U.S. ----, 2017 WL 737818 (Feb. 27, 2017).

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Defendant's [sic] Motion to Dismiss Claims in Amended Complaint [Docket No. 59] is granted.  It is further

**ORDERED** that plaintiff's fourth and fifth claims for relief are dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(6).  It is further

**ORDERED** that plaintiff's first, second, third, sixth, seventh, and eighth claims for relief are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).  It is further

**ORDERED** that, within 14 days of this order, defendants may have their costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is closed.


DATED September 19, 2017.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

22